# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

KEITH M.,

                                        Plaintiff,

        v.                                            6:19-CV-1169
                                                                    (DNH/ATB)

COMMISSIONER OF THE SOCIAL SECURITY
ADMINISTRATION,

                                    Defendant.

---

PETER W. ANTONOWICZ , ESQ., for Plaintiff
LUIS PERE , Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Court Judge.

## I.   PROCEDURAL HISTORY

Plaintiff protectively filed an application for Supplemental Security Income ("SSI") on July 9, 2015, alleging disability beginning November 15, 2010.[1] (Administrative Transcript ("T") at 76, 206-11).  His application was denied initially on November 20, 2015.  (T. 76, 90-93).  At plaintiff's request, Administrative Law Judge ("ALJ") Jennifer Gale Smith conducted a video hearing on July 17, 2018, at which plaintiff testified. (T. 33-75).   Vocational expert ("VE") Howard Steinberg testified by telephone. (T. 70-75).

---

[1] Notwithstanding plaintiff's alleged onset date, he is not eligible for SSI benefits prior to the month of his July, 2015 application. 20 C.F.R. § 416.202(g).  Thus, July 9, 2015 is the relevant onset date for plaintiff's application.  However, the ALJ stated that she still considered plaintiff's "complete medical history consistent with 20 C.F.R. § 416.912. (T. 10).

In a decision dated October 19, 2018, the ALJ found that plaintiff was not disabled. (T. 10-23). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on August 16, 2019. (T. 3-5).

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is

2

whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from

both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  **FACTS**

Plaintiff was born in June 1968 and was 50 years old at the time of the ALJ's hearing. (T. 37). He graduated from high school and completed a semester of college, but did not finish his college education. (T. 37-38). Until 2008, plaintiff was self-employed, running his own construction company. His services included remodeling and installing vinyl siding and windows. (T. 38). Plaintiff stopped working in 2008 when his twin brother used plaintiff's identity to steal construction jobs from him. (T. 38-39). Although plaintiff initially cited his knee and back impairments as the basis for disability, he ultimately conceded that he "mostly" could not work due to his depression. (T. 39-41). Plaintiff testified that his mind raced, and he could not sleep due

4

to the loss of his business, which caused him to lose "everything." (T. 41-42).

Plaintiff testified that he lived with his girlfriend, who was also the mother of his children. (T. 43). Plaintiff stated that his girlfriend did not work and was also applying for disability, but she did "everything" for him. (T. 43). Plaintiff stated that he spent his days lying on the couch and watching television. (T. 47, 48). He testified that his favorite show was "*Leave it to Beaver*," and usually watched "*Forensic Files*," but he also liked to watch the "learning" shows on PBS. (T. 49). He got up to go to the bathroom and only took a shower if he was going to a doctor's appointment. (*Id.*) His girlfriend shopped for groceries, although plaintiff went with her occasionally. She fixed things that broke around the house and mowed the lawn. (T. 47-48) His girlfriend cooked, and his daughters helped occasionally, although one daughter had a serious drug problem. (T. 47-48). Plaintiff testified that he could drive, although he did not own a vehicle, and his nephew drove him to the ALJ's hearing. (T. 48).

Plaintiff testified that he wanted to get a job "transporting people," he obtained a "Class E" driver's license, and went to work for A& D Transport, but realized that he could not "handle" the hours and would not be able to sit long before his back started bothering him. (T. 49). After stating that the advice "must be wrong," plaintiff accepted the fact that one of his health care providers told him that he should do some household chores and "'take a walk for a minimum of two hours a day.'"[2] (T. 50) (quoting T. 371). Plaintiff testified that he never took the advice and that "I don't know if I was telling her this stuff just to get through an appointment, . . . but I didn't do any of that stuff." (T.

---

[2] The ALJ stated that this advice was given to plaintiff by his "doctor," Kristen Peckham. (T. 50). However, Kristen Peckham is actually a mental health nurse. (T. 371).

50-51).  Plaintiff testified that he could not walk for two hours, that he had gained

approximately 90 pounds, and that his weight fluctuated "severely." (T. 51).

When the ALJ asked plaintiff what other mental impairments he had that would prevent

him from working, plaintiff stated that he "believed" that he had ADD[3] all his life. (T.

51).  He "looked it up on his phone" and found out what medications should be

prescribed for individuals with ADD. (*Id.*)  He asked his doctors for these "stimulants,"

but they would not prescribe them. (*Id.*)  Plaintiff testified that he had trouble with

reading comprehension, and that he could not "read a book" because he would have to

read the same page multiple times. (*Id.*)  He testified that when he watched television,

his girlfriend would have to explain what was going on because he was not "paying

attention." (T. 51-52).  Plaintiff testified that his mind was "racing all time," and that his

girlfriend "fills [him] in on parts of life that [he misses] in his head." (T. 52).

      Plaintiff testified that he was afraid to "deal with people" because he did not want

to be seen, and he would hide from people that he knew in the grocery store. (T. 52).  He

had a difficult time "articulating about anything," and he believed that he was losing his

memory. (T. 53).  Plaintiff testified that he proved that he had trouble communicating

with "important people," including his attorney, because there were many medical

records that were not "on file."[4] (*Id.*)  He testified that he often brought his girlfriend to

---

    [3] ADD refers to Attention Deficit Disorder.  The court notes that no medical professional has diagnosed plaintiff with this impairment, and that his treating nurse practitioner ("NP") would not prescribe medication for ADD when plaintiff requested it. (T. 511) (Progress Note by NP Thompson dated 7/22/16).

    [4] During the hearing, there was a discussion about new health care providers and missing medical records from the file. (T. 35-36) (attorney discovered the day before the hearing that plaintiff had a new treating physician whose treatment records were not in the file), (T. 39-40) (records of plaintiff's knee impairment).  Plaintiff's attorney stated that, although he was taking responsibility for

doctors' appointments so that she could remind the doctor of all his problems. (*Id.*)
Plaintiff also testified that he missed a previously scheduled ALJ's hearing because he
said he had the flu. (T. 53).  However, plaintiff stated that he had been awake for several
days, and his mind was not "fresh," so he felt "sick" as if he had the flu. (T. 54).

Plaintiff also testified about his relationship with his brother, stating that plaintiff
finally forgave him for stealing his identity. (T. 55).  Plaintiff had trouble understanding
questions regarding his alleged inability to "distinguish between acceptable and
unacceptable behavior." (T. 56).  The plaintiff also could not think of an instance in
which he failed to "behave appropriately" since July 15, 2015.[5]  Plaintiff testified that he
never felt free of stress and that he cried "an awful lot" in the bathroom so that his
family did not see him. (T. 59).  However, plaintiff stated that he never had trouble
controlling his anger, because he was "never" angry. (*Id.*)  He just avoided the
confrontation. (*Id.*)

Plaintiff testified that he had trouble staying on a schedule because he could not
control his sleeping habits, and his mind was always spinning. (*Id.*)  He just wanted to
be forgotten. (*Id.*)  Although he would never kill himself, he testified that he would not
have minded if the pulmonary embolism had killed him.[6] (T. 60).  Plaintiff stated that he
thought about killing himself every day. (T. 60).  Although plaintiff's attorney

the absence of files, his client's symptoms contributed to the lack of information and the absence of
some records from the file, due to his difficulty with communication and organization. (T. 74).

[5] Plaintiff mentioned his hospitalization for a suicide attempt in 2014, which would have been
an example of a failure to "behave appropriately."  However, the 2014 suicide attempt was before the
SSI eligibility date of July 15, 2015. (T. 55-56).

[6] Plaintiff testified earlier that he had been hospitalized a month prior to the hearing due to a
pulmonary embolism. (T. 57).

attempted to elicit testimony from the plaintiff, claiming that he had trouble making appropriate decisions, the plaintiff did not allow himself to be led. (T. 60-61). Plaintiff stated "[o]h, I could make decisions." (T. 60). In fact, plaintiff testified that he made all the decisions in the household because his girlfriend was "horrible with decisions." (T. 61).

Counsel then asked plaintiff if he had trouble concentrating. (T. 62). Plaintiff testified that he was always trying to figure out how to get out of "the mess" that his family was in and how they were "going to survive." (*Id.*) Plaintiff stated that he could not do anything because he was constantly worrying about his family and his daughters. (*Id.*) However, earlier during the hearing, plaintiff testified that he had a garage sale to sell his tools so that he could buy food and pay the bills. (T. 50). Plaintiff testified that determining how to survive, pay his bills, pay for food, and remain in his home were stressors for him. (T. 64).

He testified that his family might be homeless by "the end of the month" because he missed some written correspondence and telephone calls regarding "Section 8" housing, and "they" thought plaintiff did not need it anymore. (T. 64). When asked how he was going to solve that problem, plaintiff testified that his girlfriend went to "Catholic Charities" to fill out another form, and they were put on a "waiting list." (T. 64-65).

Plaintiff testified that his doctors told him to start doing little things, like going for walks or preparing a meal so that he would be less depressed, but he had been unable to do those things due to the depression. (T. 65-66). Plaintiff stated that he was "just too depressed," and he could not move. He had a combination of physical and mental

8

impairments, his back and knees hurt all night long, and it was difficult to get comfortable, which prevented him from sleeping. (T. 66-67). When plaintiff finally fell asleep, he had "night terrors," and he had recently begun to wet the bed. (T. 66). He testified that he had not told the doctor about the bed wetting, but that at a previous appointment, Dr. Burke mentioned that plaintiff's kidneys were not "filtering" properly. (*Id.*)

VE Howard Steinberg testified by telephone. In response to a hypothetical question from the ALJ, which outlined the RFC discussed below for both sedentary and light work with additional restrictions, the VE testified that plaintiff could perform a significant amount of alternate work in the national economy. (T. 72-73). The VE found that the hypothetical individual could perform the light work jobs of mail clerk, office helper, and hotel housekeeper. (T. 71-72). With respect to sedentary work, the VE found that plaintiff could only perform a surveillance system monitor job. (T. 72-73). The VE also testified that an employer would only tolerate an individual being off-task ten percent of a given day and would only tolerate one day per month unscheduled absence.[7] (T. 73). At the end of the hearing, the ALJ informed counsel and the plaintiff that she was considering ordering an additional consultative psychiatric examination of the plaintiff, because the examination in the record "was done way back when." (T. 74).

There are a substantial number of relevant medical records in the file. However, rather than summarizing the medical records at the outset, I will refer to the pertinent records and proceedings during my discussion of the plaintiff's arguments.

---

[7] The VE stated that in the case of a surveillance monitor, the tolerance of off-task behavior might be even less than ten percent, given the nature of the job. (T. 73).

## IV.    THE ALJ'S DECISION

After finding that plaintiff had not engaged in substantial gainful activity

("SGA") since his July 9, 2015 application date, the ALJ found that plaintiff had the

following severe impairments at step two of the sequential analysis: degenerative

changes and stenosis of the lumbar spine, mild degenerative changes of both knees,

asthma, obesity, anxiety disorder, depressive disorder, and opioid dependence. (T. 12-

13).  At step three of the sequential analysis, the ALJ found that none of plaintiff's

severe impairments, either singly or in combination met or medically equaled the

severity of a listed impairment. (T. 13-15).  In doing so, the ALJ considered Listing 1.02

(Major dysfunction of a joint(s) due to any cause); 1.04 (Disorders of the spine); 3.03

(Asthma); 12.04 (Depressive, bipolar, and related disorders); and 12.06 (Anxiety and

obsessive-compulsive disorders). (T. 13).

In reviewing the listing severity of plaintiff's mental impairments, the ALJ found

that plaintiff did not meet the paragraph "B" criteria[8] of listings 12.04 and 12.06. (T.

13).  The ALJ found that plaintiff had a mild limitation in understanding, remembering,

or applying information; had a moderate limitation in interacting with others; a mild

limitation in concentrating, persisting, and maintaining pace; and a moderate limitation

in adapting or managing himself. (T. 13-14).  The ALJ also found that the paragraph

"C" criteria were not met.[9]

---

[8] In order to meet the paragraph "B" criteria, plaintiff's mental impairments must result in at least one "extreme" or two "marked" limitations in one of the broad areas of functioning, listed as (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing himself. (*Id.*)

[9] In order to meet the "C" criteria of both Listing 12.04 and 12.06, plaintiff must establish "'(1) medical documentation of the disorder for a period of at least two years and (2) evidence of both (a)

At step four of the sequential evaluation, the ALJ found that plaintiff had the physical RFC to perform light work, except that plaintiff could frequently balance, kneel, crouch, crawl, climb ramps and stairs, but he should not climb ladders, ropes, and scaffolds. (T. 15). Plaintiff could reach "frequently." (*Id.*) The plaintiff should have no more than occasional exposure to respiratory irritants such as dust, odors, fumes, gasses, extreme temperatures, and humidity. Mentally, plaintiff retained the ability to work at simple, routine, and repetitive tasks, and he could work at a low stress job. (*Id.*) The ALJ defined "low stress" as involving occasional decision-making, use of judgment, and changes in the work setting. (*Id.*) His work should be "goal-oriented," rather than production paced, and he should only have occasional contact with co-workers, supervisors, and the public. (*Id.*)

The ALJ reviewed both the physical and mental medical evidence, analyzing the reports of doctors, psychologists, and other medical providers, giving specific weight to all but one provider's opinion.[10] (T. 15-21). Based on the RFC, and VE Steinberg's testimony, the ALJ found that plaintiff could not perform his past construction work. (T. 21-22). The ALJ discussed the Medical-Vocational guidelines, but determined that plaintiff had additional impairments which would impede his ability to perform all or

---

medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the mental disorder," as well as (b) "marginal adjustment, that is, the claimant has minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life.'" *Ivey v. Comm'r of Soc. Sec.*, No. 1:19-CV-00657 (EAW), 2020 WL 5046261, at *9 (W.D.N.Y. Aug. 27, 2020) (quoting *Jeffrey W. v. Berryhill*, No. 1:18-CV-0115 (LEK), 2019 WL 2210593, at *7 (N.D.N.Y. May 22, 2019) (quoting 20 C.F.R. Subpt. P, App. 1, § 12.06(C)).

[10] The ALJ did not give specific weight to the opinion of consultative psychologist, Dr. Sara Long, Ph.D. (T. 21). The court will discuss the ramifications of this omission below.

substantially all of the requirements of light work. (T. 22). Thus, the ALJ turned to the VE, who considered the additional limitations that the ALJ set forth in her RFC. (T. 22-23). Based on the VE's response to the ALJ's hypothetical question, the ALJ found that plaintiff could perform the "representative occupations" of mail clerk (light-unskilled); office helper (light-unskilled); and housekeeper (light-unskilled). (T. 23). Thus, the ALJ concluded that plaintiff was not disabled. (T. 23).

## V. ISSUES IN CONTENTION

Plaintiff raises one main argument, with three sub parts in support of his position that the ALJ's decision is not supported by substantial evidence:

1. The ALJ committed errors of law in determining plaintiff's RFC. (Plaintiff's Brief ("Pl.'s Br.") at 10-16) (Dkt. No. 11).

   a. The ALJ should not have ordered a post-hearing consultative examination. (Pl.'s Br. at 12-13).

   b. The ALJ's reasons for "deferring" to the post-hearing examiner's report were insufficient. (Pl.'s Br. at 13-15).

   c. The ALJ should have made two separate RFC findings based on plaintiff's "improvement." (Pl.'s Br. at 15-16).

Defendant argues that the Commissioner's decision is supported by substantial evidence. (Defendant's Brief ("Def.'s Br.") at 4-11) (Dkt. No. 12). For the following reasons, this court agrees with the defendant and will recommend affirming the Commissioner's decision.

## VI. RFC/WEIGHING EVIDENCE

### A. Legal Standards

#### 1. RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004). The RFC assessment must also include a narrative

discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 2.    Weight of the Evidence/Treating Physician

In making a determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. *See* SSR 96-5p, 1996 WL 374183, at *2. These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*,

14

362 F.3d 28, 32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20

C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If an ALJ decides not to give the treating

source's records controlling weight, then he must explicitly consider the four *Burgess*

factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of

medical evidence supporting the opinion; (3) the consistency of the opinion with the

remaining medical evidence; and (4) whether the physician is a specialist." *Estrella v.*

*Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting *Burgess v. Astrue*, 537 F. 3d 117,

120 (2d Cir. 2008)).  "[T]he ALJ must 'give good reasons in [its] notice of

determination or decision for the weight [it gives the] treating source's [medical]

opinion.' " *Id.* at 96 (citing *Halloran v. Barnhart*, 362 F.3d at 32).  Should an ALJ

assign less than controlling weight to a treating physician's opinion and fail to consider

the above-mentioned factors, this is a procedural error.  *Id.*  It is impossible to conclude

that the error is harmless unless a "searching review of the record . . . assures us that the

substance of the treating physician rule was not traversed." *Id.*

### B.    Application

#### 1.    Post-Hearing Consultative Examination

As stated above, in developing plaintiff's RFC, the ALJ reviewed the medical

evidence, including a post-hearing consultative psychological evaluation and medical

source statement ("MSS"), ordered by the ALJ and conducted by psychologist Dr. Sara

Long, Ph.D. (T. 21, 74, 727-31 & 732-34).  Plaintiff first argues that the ALJ should not

have ordered the consultative evaluation unless the plaintiff's condition had improved.

(Pl.'s Br. at 12) (citing 20 C.F.R. § 404.1519(a)(4)).[11]  Thus, before addressing the weight that the ALJ gave to the medical reports, I will address whether the ALJ should have ordered the consultative report in the first instance.

"'The ALJ has discretion on a case-by-case basis to determine whether a consultative examination is needed, and is only required to order such an examination where the examination is necessary to resolve a conflict or ambiguity in the record.'" *Beau M. v. Comm'r of Soc. Sec.*, No. 8:18-CV-1170 (ATB), 2020 WL 586868, at *9 (N.D.N.Y. Feb. 6, 2020) (quoting *Phelps v. Colvin*, 20 F. Supp. 3d 392, 401 (W.D.N.Y. 2014) (citing 20 C.F.R. § 404.1519a(b)(4); *Simon v. Colvin*, No. 6:12-CV-6381, 2013 WL 4094612, at *6-7 (W.D.N.Y. Aug. 13, 2013)).  "'Where a plaintiff suggests a possible mental impairment, the ALJ must assess whether there is any evidence of work-related functional limitations resulting from the possible mental impairment which have not been adequately addressed in the record.'" *Id.* (quoting *Brown v. Astrue*, No. 11-CV-6392 (T), 2012 WL 2953213, at *7 (W.D.N.Y. July 19, 2012) (citing *Haskins v. Comm'r of Soc. Sec.*, No. 5:05-CV-292, 2008 WL 511378, at *7, n. 5 (N.D.N.Y. Nov. 25, 2008)).

The section cited by plaintiff is only ***one*** of the four "listed" reasons that the ALJ may in her discretion order a consultative evaluation.  The regulation begins by stating that "[w]e may purchase a consultative examination to try to resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination

---

[11] Plaintiff has cited the regulation that is relevant to disability benefit cases.  The appropriate section in SSI cases is 20 C.F.R. § 416.919a.  The sections are identical, but this court will cite the relevant SSI section in its recommendation.

or decision on your claim." 20 C.F.R. § 416.919a (b).  The regulation specifically adds

that "[s]ome *examples* of when we might purchase a consultative examination to secure

needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or

prognosis, *include but are not limited to*" the four listed reasons. 20 C.F.R. § 416.919a

(b) (emphasis added).  It is quite clear that " a change in condition" is only one

additional reasons for ordering an updated consultative examination. *Id.* § 416.919a

(b)(1)-(b)(4).

At the hearing in this case, the ALJ stated that she was considering ordering an

"additional psychiatric CE" because the previous CE was "done way back when." (T.

74).  Counsel did not object and responded "[v]ery good your honor."[12] (*Id.*)  The

previous psychiatric consultative opinion, authored by Katherine Warden, Ph.D. was

dated November 11, 2015, almost three years prior to the ALJ's hearing. (T. 431-36).

Because plaintiff's central basis for claiming disability involves his mental impairment,

and there are a great deal of treatment notes which were written after Dr. Warden's

evaluation, some of which are inconsistent with that evaluation as discussed below, the

ALJ was well within her authority under the regulations to order a new consultative

psychiatric evaluation.

The court also notes that there was some discussion about the absence of certain

medical records in the file due to plaintiff's failure to communicate with his attorney.

(*See e.g.* T. 35-36, 39, 40, 74) (Attorney stated that he found out the night before the

_____

[12] Although defendant also argues that the plaintiff waived his argument that the ALJ should have better explained why she was ordering the consultative evaluation (Def.'s Br. at 7), he also argued in the alternative, that the regulations gave her discretion to order the evaluation (Def.'s Br. at 6-7).  Rather than determining whether plaintiff waived the argument, I will consider the merits.

hearing that plaintiff had a "new" primary care physician, who he had been seeing for more than one year, and later, counsel stated that he only found out about another doctor "this very moment"). Counsel was given the opportunity to complete the record after the hearing. (T. 73-74). Thus, the ALJ was well-within her discretion under the regulations to order an updated consultative evaluation, and the court may turn to plaintiff's argument that the ALJ did not weigh the evidence properly, including Dr. Long's evaluation.

### 2. Weight of the Evidence

Plaintiff argues that the ALJ should have accorded great weight to the MSS written by treating NP Lee Thompson and the first consultative psychiatric examiner, Katherine Warden, Ph.D. The ALJ gave "little weight" to NP Thompson's check-box MSS, which opined that plaintiff had "moderate" limitations in his ability to understand, remember or apply information, and marked limitations in his ability to interact with others, use good judgment, appropriately deal with stress, concentrate, persist, maintain pace, and adapt or manage himself. (T. 21, 442-45). The ALJ explained the weight assigned to this opinion by stating that NP Thompson was not an acceptable medical source, and that the MSS findings were "far more severe and inconsistent [in] comparison with NP Thompson's recommendations that the claimant keep busy and [plaintiff's] own statements that he is able to visit with friends, take daily walks, and obtain a Class E license." (T. 21).

The ALJ also gave "little weight" to Dr. Warden's MSS, which found that plaintiff had "marked" limitations in his ability to maintain a regular schedule, make appropriate decisions, relate adequately with others, and appropriately deal with stress.

(T. 20, 435).  Dr. Warden also opined that plaintiff could maintain attention and concentration and learn new tasks, but he had moderate limitations in his ability to perform complex tasks independently. (*Id.*)  Dr. Warden concluded that plaintiff had no limitations in his ability to follow and understand simple directions and instructions and perform simple tasks independently or under supervision.(*Id.*)  The ALJ's stated reason for the weight he gave to Dr. Warden's MSS was that, even though she was "program knowledgeable and examined the claimant," her findings were "not consistent with the complete record of medical evidence or the claimant's own reports of his ability to do activities of daily living." (T. 20).

The ALJ found that plaintiff could perform work[13] involving simple, routine, and repetitive tasks. (T. 15).  Plaintiff should work at a "low stress job," which is "defined" as one involving occasional decision-making, occasional judgment, and occasional changes in the work setting.  Plaintiff could do "goal-oriented" work, rather than work involving "production pace," and he should have only occasional contact with co-workers, supervisors, and the public. (*Id.*)

The ALJ's mental RFC analysis is supported by substantial evidence.  The ALJ correctly recognized that NP Thompson was not an acceptable medical source[14] during

---

[13] Plaintiff challenges only the ALJ's mental RFC finding.  Therefore, the court will limit its consideration to whether the mental component of plaintiff's RFC is supported by substantial evidence.  The court notes that the ALJ engaged in a detailed discussion of the medical evidence of plaintiff's physical abilities. (T. 16-18).

[14] For claims filed prior to March 27, 2017, nurse practitioners were not acceptable medical sources for diagnosing medical impairments. 20 C.F.R. § 416.927.  For claims filed after March 27, 2017, the regulations have been amended.  The Agency will no longer defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from the plaintiff's medical sources. 20 C.F.R. § 416.920c.  In a post-March 27, 2017, "supportability" and "consistency" are the most important factors in determining

the relevant time period, but still considered the opinion.  ALJs are not required to afford the same level of deference to the opinions of "other sources," including nurse practitioners, as they are to the opinions of "acceptable medical sources" like physicians and psychologists. *See* 20 C.F.R. §§ 404.1502, 404.1513(a),(d); 416.913 (a),(d); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).  However, other source opinions are important and must be considered "on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, 2006 WL 2329939, at *3.

In this case, the ALJ's found that NP Thompson's restrictive MSS was inconsistent with his recommendations that the plaintiff "keep busy" and was inconsistent with plaintiff's own statements that he could visit with friends, take walks,[15] and obtain a Class E driver's license.  The ALJ may not have elaborated on the inconsistencies between NP Thompson's MSS and his treatment notes because he was not an acceptable medical source.  However, a review of the record evidence shows that there are various inconsistencies between NP Thompson's MSS and the progress notes from his practice.[16]  The plaintiff's ability to obtain a Class E driver's license is inconsistent with a "marked" limitation on concentration and ability to deal with

the how persuasive the agency finds a medical source's medical opinions or prior administrative medical findings to be. 20 C.F.R. § 416.920c(2)(b).

[15] The court assumes that the ALJ's reference to plaintiff taking walks refers to his physical abilities, which are not at issue in this case.

[16] NP Thompson works at the Mohawk Valley Psychiatric Center ("MVPC").  The progress notes from MVPC include NP Thompson's notes, together with "collaborative" progress notes by social workers and mental health nurses. (*See* T. 478-607) (containing progress notes by NP Thompson, Social Workers Ryan Mellon, Nurse Beth Ruggiero, and Mental Health Nurse Kristen Peckham).

stress.[17]   If one already has a driver's license, obtaining a Class E license only involves

filling out the application.   However, the plaintiff would have to obtain the application,

complete the application, and follow through with all the requirements.   On June 26,

2017, NP Thompson's treatment notes state that plaintiff told him about obtaining the

Class E license so that he could get a job with a medical transport company. (T. 561).

NP Thompson stated that plaintiff was "enthusiastic," and his mood was "good," even

though his affect was "constricted." (*Id.*)

   In addition, the court notes that although NP Thompson states in his August 10,

2017 MSS that plaintiff has a "marked" limitation in using judgment, his August 7,

2017 treatment notes, dated three days prior to the MSS, state that plaintiff's judgment

and insight were "fair," and his memory was intact. (T. 570-71, 572).   On August 19,

2016, plaintiff met with Kristen Peckham, plaintiff's then-mental health nurse, and NP

Thompson.   Nurse Peckham noted that plaintiff's father "ran out of things for him to do

at the house," and plaintiff got some "spending money." (T. 517).   Plaintiff told her that

he felt better when he was active, and they discussed the importance of staying active

and busy. (*Id.*)   The other progress notes from the same practice repeat the same

findings about plaintiff's memory,[18] judgment, and insight. (*See* T. 523, dated

September 21, 2016) (thought process-intact/logical; memory-intact; behavior-

---

   [17] A Class E driver's license allows the driver to drive "for-hire" vehicles which transport less than 14 people. https://dmv.ny.gov/driver-license/nys-driver-license-classes.

   [18] The court notes that, although plaintiff testified that he could not "read a book," due to his lack of attention, he was able to research ADD on the internet and determine what medications could be prescribed for this impairment.   He remembered the name of the medication so that he could request it from his health care provider. (T. 51, 511).   Plaintiff also testified that he took his girlfriend to doctors' appointments (T. 53), but there are no indications in the record that plaintiff's girlfriend was present at any medical appointment to help plaintiff articulate his medical problems.

unremarkable; judgment, insight, and impulse control-fair). This was true even when plaintiff's mood was depressed, and his distress level was "moderate." (T. 527-28) (records dated 12/1/16).

Plaintiff argues that the ALJ should have given more weight to NP Thompson's assessment because it was consistent with the evaluation by the first consultative examiner, Dr. Warden. However, as stated above, the ALJ was justified in obtaining an updated consultative report and in relying upon Dr. Long's assessment of plaintiff's abilities, in addition to plaintiff's own testimony regarding his activities. The court also notes that NP Thompson's assessment is contrary to the treating notes authored by the plaintiff's new treating provider, Dr. Robert Burke, M.D., whose reports were submitted after the hearing because plaintiff's counsel was unaware that plaintiff began seeing Dr. Burke. (T. 36-37, 40).

Plaintiff began seeing Dr. Burke on December 15, 2016 because of his history of opioid abuse and his interest in beginning a Suboxone[19] program. (T. 700-702). During plaintiff's initial visit to Dr. Burke's practice, plaintiff saw Licensed Practical Nurse ("LPN") Deanna Raynor and "denied" psychiatric symptoms. (T. 700-701). His treatment with Suboxone was started. (T. 702). In approximately nine subsequent visits, plaintiff denied psychiatric symptoms, and Dr. Burke wrote that plaintiff's psychiatric examination was "normal," with "no evidence of depression, anxiety, or agitation." (T. 697-98 (12/29/16); 695-96 (1/10/17); 693-94 (2/9/17); 691-92 (3/9/17); 688-89

---

[19] "SUBOXONE® (buprenorphine and naloxone) . . . is a prescription medicine used to treat adults who are addicted to (dependent on) opioid drugs (either prescription or illegal) as part of a complete treatment program that also includes counseling and behavioral therapy." https://www.suboxone.com/

(5/4/17); 686-87 (7/25/17); 681-82 (8/22/17); 679-80 (9/21/17); 675-76 (10/5/17)[20]).

Dr. Burke's assessments are more in line with the second psychiatric consultant, Dr. Sara Long. While the ALJ did not give specific "weight" to Dr. Long's assessment (T. 21), it is clear that the ALJ relied upon the limitations specified in Dr. Long's report.[21] The ALJ noted that, after the plaintiff began regular treatment sessions and committed himself to the Suboxone program, he began to stop obsessing about the problems with his brother, and the loss of his previous work life, and he was working on mending his family relationships.[22] (T. 21). Dr. Long found that the plaintiff was "more capable than his work history indicates." (T. 21). Plaintiff testified that he makes all the decisions in the family and is constantly trying to figure out how to survive. (T. 60-61, 62).

Plaintiff argues that the ALJ minimized plaintiff's mental health symptoms when

---

[20] The October 5, 2017 report did not contain a specific psychiatric examination section, but the review of systems ("ROS") noted that the plaintiff "denies" depression, mood swings, or anxiety. (T. 676).

[21] Dr. Long found that no limitations were observed in plaintiff's ability to perform simple and complex tasks and making appropriate decisions within context. (T. 730). He would be able to interact adequately with others. (*Id.*) Plaintiff was able to maintain attention and concentration, and Dr. Long found that he would be able to maintain a regular schedule. (*Id.*) Dr. Long also stated that plaintiff might have a mild limitation in regulating his emotions, but appears to be able to control his behavior, maintain personal hygiene, and be aware of appropriate precautions. (*Id.*)

[22] In June of 2016, plaintiff told his mental health nurse that he was socializing and getting out of the house more. (T. 506). He also told Nurse Peckham that he was in good spirits, and that the reconciliation with his family was a huge weight lifted off of his shoulders. (*Id.*) On the same day, he told NP Thompson that his mood was okay, that he was happy to be on speaking terms with his family again. (T. 507). NP Thompson noted that plaintiff's affect was "constricted," but that his appearance was neat and clean, he had appropriate eye contact, his speech was clear, his mood was euthymic, he was fully oriented, and his thought processes were logical. (T. 507). Plaintiff was in no distress, his behavior was unremarkable, his memory was intact, and his judgment, insight, and impulse control were all fair. (T. 508).

she "suggest[ed]" that they were limited to problems involving his family relationships. (Pl.'s Br. at 15).  The ALJ found that plaintiff has a severe mental impairment.  She did not suggest that all of plaintiff's symptoms related to his impaired family relationships. The ALJ only commented that, after he began his Suboxone treatments, he was able to obsess less about his brother and the loss of his work, and he was trying to repair the relationship with his family. (T. 21).  The ALJ was reviewing the facts as stated by plaintiff's health care providers in the record, not minimizing the plaintiff's symptoms.[23] There is no question that plaintiff suffers from severe mental impairments, the issue is whether the impairments and the symptoms resulting from those impairments are disabling for purposes of Social Security.  Conflicts in the evidence are for the ALJ to resolve. *VanNote v. Comm'r of Soc. Sec.*, No. 1:18-CV-1143(DB), 2019 WL 5865452, at *6 (W.D.N.Y. Nov. 8, 2019) (citing inter alia *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (holding that it is within ALJ's discretion to sort through and resolve conflicts in evidence)).

    Plaintiff argues that in her step three determination, the ALJ found that plaintiff had "moderate" limitations in the ability to maintain a work schedule, but never explained how "such an individual could possibly sustain work activity." (Pl.'s Br. at 13).  In step three of the sequential analysis, the ALJ was considering the four broad areas of functioning and found that the plaintiff had "moderate" limitations in his ability to interact with others and in his ability to perform activities within a schedule and

---

[23] As stated above, in June of 2016 (prior to the beginning of the Suboxone program, plaintiff told his mental health nurse that he was in good spirits and that the family reconciliation was a "huge" weight lifted from his shoulders. (T. 506).

maintain attendance. (T. 13).  In making this determination, the ALJ discussed the conflicting evidence, but apparently determined that Dr. Long's finding of "moderate" limitations was more consistent with the record. (T. 14).

The mental element of the ALJ's RFC limited plaintiff to low stress work, involving occasional decision-making, occasional use of judgment, and occasional changes in the work setting. (T. 15).  The RFC also limited plaintiff to goal oriented work, involving only occasional contact with co-workers, supervisors, and the public. (T. 15).  An RFC which specifically limits plaintiff to light work that involves only simple, routine tasks with minimal contact with coworkers, supervisors, or the public, adequately "'accounts for [the plaintiff's] limitations for performing activities within a schedule and maintaining regular attendance.'" *Andrea N. v. Saul*, No. 3:18-CV-1186 (CFH), 2020 WL 1140512, at *6 (N.D.N.Y. Mar. 9, 2020) (quoting *Shannon v. Berryhill*, No. 6:16-CV-06796 (MAT), 2018 WL 6592181, at *3 (W.D.N.Y. Dec. 13, 2018); *Lowry v. Comm'r of Soc. Sec.*, No. 1:15-CV-1553 (GTS/WBC), 2017 WL 1290685, at *4 (N.D.N.Y. Mar. 16, 2017), *report and recommendation adopted*, 2017 WL 1291760 (N.D.N.Y. Apr. 6, 2017) (moderate limitations in the ability to maintain concentration or a regular schedule or to deal with stress do not prevent a claimant from performing simple, routine work); *Landers v. Colvin*, No. 14-CV-1090 (S), 2016 WL 1211283, at *4 (W.D.N.Y. Mar. 29, 2016) (limitation to "'simple, repetitive, and routine tasks' account[ed] for [p]laintiff's limitations [in] maintaining attention and concentration, performing activities within a schedule, and maintaining regular attendance"); *Sipe v. Astrue*, 873 F. Supp. 2d 471, 481 (N.D.N.Y. 2012) (moderate limitations in "relating to instructions, concentration, attendance" were consistent with

unskilled work)).  The ALJ's RFC accounted for even moderate limitations in plaintiff's ability to perform within a schedule and maintain attendance,[24] she gave proper weight to the medical evidence of record, and the ALJ's RFC determination was supported by substantial evidence.

### 3.    Two RFC Determinations

Finally, plaintiff argues that the ALJ should have established two RFCs if she believed that the plaintiff's condition "improved." (Pl.'s Br. at 15-16).  Plaintiff cites the Notice of Hearing, which states that if the ALJ finds that plaintiff is "disabled," then she "will also consider" whether the disability continued through the date of her decision and whether the plaintiff's condition "improved." (*Id.*)

As the defendant points out, the determination of "improvement" is made if the ALJ finds that plaintiff is disabled.  The ALJ did not find that plaintiff was disabled, and any "improvement" in plaintiff's condition was in comparison to his pre-application condition, not to his condition during the period in question.  Plaintiff's psychiatric hospitalization was in 2014, and his application for SSI was in July of 2015.  He had no further psychiatric hospitalizations, and his impairments were treated with medication and therapy.  His condition and psychiatric examinations stayed relatively constant after

---

[24] The court notes that the record contains several instances in which plaintiff missed his therapy appointments.  Although some of the records list these as "no show" appointments, it was later explained by plaintiff's social worker, Ryan Mellon, that cancellation after a particular time would be registered as a "no show" on the electronic record. (T. 590).  However, it appears that most of the time plaintiff called to cancel or reschedule an appointment, and often, the cancellation was due to problems with transportation. (T. 589, 590, 580 (medicaid cab did not come), 582 (called to reschedule).  On November 20, 2017, plaintiff told Mr. Mellon that he received a letter from the Department of Social Services ("DSS"), telling him that he was not attending his appointments. (T. 589).  Mr. Mellon explained that when he sent records to DSS, the "no shows" were on those records.  The plaintiff asked Mr. Mellon to call DSS and explain the problem. (*Id.*)  Clearly, plaintiff is able to maintain a schedule and understood the consequences of a failure to attend his therapy sessions.

the July 2015 application date, notwithstanding his depression. (T. 379-80 (10/21/15), 384-85 (11/20/15), 389-90 (12/18/15), 395-96 (2/24/16), 492-93 (3/23/16), 501-02 (5/16/16), 507-08 (6/15/16), 511-12 (7/22/16), 518-19 (8/19/16), 522-23 (9/21/16), 534-35 (2/2/17), 541-42 (3/20/17), 561-62 (8/26/17), 571-72 (8/7/17), 585-86 (11/2/17), 610-11 (3/19/18).

Although plaintiff's symptoms understandably were better some days and worse on other days, he was generally described as having intact memory, and fair judgment, insight, and impulse control. (*Id.*)  He was fully oriented, his thought processes were logical, his behavior was often listed as "unremarkable," his appearance was neat/clean, and his speech was clear, notwithstanding his depression and anxiety.  Thus, the ALJ's RFC determination is supported by substantial evidence, and the Commissioner's decision should be affirmed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and the plaintiff's complaint be **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.  These objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of HHS*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated:  September 14, 2020

Andrew T. Baxter
U.S. Magistrate Judge